UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**WALDEMAR BARANOWSKI,**

**Plaintiff,**

**v.** **Case No: 8:17-CV-301-T-27TGW**

**GEICO GENERAL INSURANCE COMPANY,**

**Defendant.**

_______________________________/

**ORDER**

This is a third-party insurance bad faith action. Before the court are Plaintiff's Motion for Partial Summary Judgment on Affirmative Defenses (Dkt. 37), Defendant's response (Dkt. 40), Geico General Insurance Company's Motion for Summary Judgment (Dkt. 39), Plaintiff's response (Dkt. 43), and Defendant's reply (Dkt. 52). Upon consideration, Defendant's Motion is **GRANTED** and Plaintiff's Motion is **DENIED** ***as moot***.

## I. UNDISPUTED MATERIAL FACTS

On May 20, 2009, Plaintiff was operating his vehicle when he lost control and struck an aluminum guardrail. (Dkt. 39-2).[1] Plaintiff and his passenger, Jiri Renotiere, were ejected from the vehicle. (Id.) Plaintiff was airlifted to Lee Memorial Hospital and was unconscious for seven days. (Dkt. 39-3 at 156). Renotiere was transported to Desoto Memorial Hospital.

Plaintiff was insured by Geico under automobile insurance policy number 4100-54-26-97, which provided bodily injury ("BI") liability coverage of $10,000 per person and $20,000 per

[1] Material dates and occurrences have been underlined or italicized for emphasis and to assist the reader.

occurrence. (Dkt. 39-1). On June 25, 2009, Geico was informed of the accident by Plaintiff's attorney, Robert Gluck. (Dkt. 39-3 at 156). At that time, Plaintiff was still in the hospital and Gluck did not know all of the details of the accident. (Id.) That day, the claim was assigned to claims examiner Donna Sterling. (Id.) She called Gluck's office the next day and spoke with "Martha," and requested a copy of the police report (Id. at 151,154-155).

On June 30, 2009, Geico received a call from Seminole Casualty Insurance, advising that it received a $300,000 hospital bill for Renotiere and that he was still in the hospital. (Id. at 150). Seminole Casualty provided Renotiere's contact information and his wife's name. (Id.) That day, Sterling received and reviewed the police report and attempted to call Gluck to discuss the facts and determine if he had any additional information from Plaintiff. (Id. at 148-149).

On June 30, 2009, Geico Supervisor Dave Seavey reviewed the claim and directed Sterling to tender the $10,000 BI policy limits to Renotiere, once a determination was made of who was driving at the time of the accident. (Id. at 147). That day, Sterling spoke with Renotiere's wife who advised that they were represented by attorney Randall Spivey. (Id.) Sterling spoke with Spivey and Martha in Gluck's office, both of whom confirmed Plaintiff was the driver. (Id.)

On July 1, 2009, *just six days after Geico was notified of the loss*, Seavey authorized tender of the BI policy limits to settle Renotiere's injury claim, noting there was no need to investigate who was driving. (Id. at 146). *That day,* Sterling attempted to call Spivey to inform him of this decision, but was told by his assistant that he was unavailable. (Id.) Sterling asked that he call her back because she needed information to tender the policy limits. (Id.) She faxed Spivey correspondence confirming Geico's decision to tender the $10,000 policy limits and requesting his federal tax ID number and Renotiere's marital status so that the settlement check could be issued.

As it turned out, Sterling mistakenly addressed the fax to Gluck (Id.; Dkt. 39-7). Notwithstanding, as the parties acknowledged during oral argument, the fax was actually sent to and received by Spivey's office, despite being addressed to Gluck. (Id.; Dkt. 39-3 at 145; Dkt. 43-2 at 45:23-46:14). And on July 6, when she realized her fax was mistakenly addressed to Gluck, Sterling spoke with Spivey's assistant to notify his office of the error. She again requested Spivey's tax ID number and verification of Renotiere's marital status. She also sent another letter to Spivey with the correct address and enclosed an Affidavit of Coverage. (Dkt. 39-9). She called Spivey the next day to obtain the tax ID number and Renotiere's marital status. (Dkt. 39-3 at 144). Spivey's assistant would not provide the information and advised she would have Spivey call back. (Id.)

In the meantime, Sterling was able to independently obtain Spivey's tax ID number, and on July 7, 2009, sent him a letter tendering the $10,000 policy limits check, which Spivey's office received on July 13, 2009.[2] (Dkt. 39-11). Sterling enclosed a "Release of All Claims" form, explaining:

> Not all release forms precisely fit the facts and circumstances of every claim. Should you have any questions about any aspect of the release terms, please call me immediately. *You may also send me any suggested changes, additions or deletions with a short explanation of the basis for any changes you suggest; or if you have a release that you desire to use, please forward it to me.*

(Id. at 1) (emphasis added).

On July 22, 2009, Sterling was advised that Gluck no longer represented Plaintiff and that he was still in the hospital. (Dkt. 39-3 at 142). That day, Sterling called Spivey to confirm receipt of the settlement check, but was again told that he was unavailable. (Id.; Dkt. 39-13; Dkt. 39-14).

On July 29, 2009, Sterling attempted to obtain a recorded statement from Plaintiff, but he

[2] The check was dated July 8, 2009. (Dkt. 39-11).

advised he was obtaining a new attorney and would have the attorney contact Geico. (Dkt. 39-3 at 140). That day, Sterling called Spivey's office to inquire about the status of the release. (Id.) Once again, he was not available. (Id.) On July 30, 2009, Sterling sent Spivey a letter to follow up on the release. (Dkt. 39-15).

On September 15, 2009, Sterling conducted a recorded interview of Plaintiff and informed him the $10,000 policy limits had been tendered to Renotiere, but that he had not yet signed the release. (Dkt. 39-3 at 123). That day, Sterling called Spivey to follow up on the tender and release. (Id.) Once again, he was not available. (Id.; Dkt. 39-16). On September 16, 2009, Sterling sent Spivey a letter, stating: "We have reached an agreement to settle this claim and sent you a Release to be signed, notarized and returned to our office." (Dkt. 39-17).

Almost a month later, on October 15, 2009, Sterling received two letters from Spivey dated October 13, 2009. (Dkt. 39-18). The first accused her of attempting to create a "false record" by stating they had reached an agreement to settle the claim, and enclosed a letter of representation and information request form. Spivey also stated that his clients are "ready" to settle and that she should only communicate with him in writing. (Id.) The second letter requested statutory insurance disclosures pursuant to Florida Statute § 627.4137 within twenty days, conditioning any settlement on receipt of all of the requested insurance information. (Id.) He also requested copies of any statements made by his client, and color copies of any photographs regarding the accident. (Id.)

*Immediately* after receiving Spivey's letters on October 15, 2009, Sterling responded, asking that Spivey disregard her September 16, 2009 letter and apologizing for some of its content. (Dkt. 39-19). She advised: "Our intent was to obtain the status of the bodily injury release along with the $10,000.00 bodily injury check sent to you on July 7, 2009." (Id.) As requested, she enclosed copies

of all correspondence from Geico to Spivey, an Affidavit of Coverage, certified copy of the policy, and photographs of Plaintiff's vehicle. (Id.)

On November 6, 2009, Sterling received a letter from Spivey rejecting settlement on the purported basis that he had not received the requested insurance information by November 2, 2009, and that his clients had agreed to sign a general release of bodily injury claims, not the all-encompassing release Geico sent. (Dkt. 39-20). He also indicated that suit would be filed. (Id.). When she received this letter, Sterling called and left a message for Spivey to call her back to discuss the rejection. (Id.)

On November 9, 2009, Sterling's supervisor, Paul Ohsiek, reviewed Spivey's rejection letter and noted that it appeared that Spivey did not agree with the proposed release sent to him, but indicated that he made no corrections to the proposed release and did not provide a proposed release. (Dkt. 39-3 at 106.) Ohsiek also noted that Spivey referenced a property damage claim, but that Renotiere was a passenger in the vehicle and Spivey had not made any property damage demand for personal items. (Id.)

On November 13, 2009, Sterling responded to Spivey's settlement rejection letter by fax, stating:

> This will confirm receipt of your letter dated November 2, 2009. We are a bit confused as to its contents. Your letter states your client is not willing to sign our proposed release previously sent to you on July 7, 2009. However, you have not provided us with your proposed language/addendum for the release. As previously stated in our letter to you dated October 15, 2009, we will be happy to review any proposed language or addendum you may have.
>
> You advised you have not received the "insurance information requested in my other letter before the 20-day deadline, November 2, 2009." Enclosed, please find a copy of the Certified Return Receipt (received by us on October 22, 2009) showing your office signed for the Affidavit of Coverage, Certified Copy of the Policy and Photos

> of our insured's vehicle sent to you in our letter dated October 15, 2009. An Affidavit of Coverage was also sent to you on July 6, 2009.
>
> With regards to your comment "GEICO requires that all claims be released, which includes property damages claims...." Our investigation shows your client Jiri Renotuiere was a passenger in our insured's vehicle. Please inform us if your client is making a claim for personal property as a result of the above captioned loss.

(Dkt. 39-23).

That day, after receiving Sterling's letter, Spivey filed suit against Plaintiff on behalf of Renotiere and his wife. (Dkt. 39-24). The next day, Sterling attempted to contact Spivey about the claim after she received a copy of the Complaint and the returned check, but he was, once again, unavailable. (Dkt. 39-3 at 101). She notified Plaintiff that suit had been filed against him. (Id.)

On June 29, 2012, after a jury trial, a Second Amended Final Judgment was entered in favor of the Renotieres against Plaintiff for $2,686,383.50. (Dkt. 1-4). On February 7, 2017, Plaintiff filed this bad faith action against Geico. (Dkt. 1).

## II. STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). The court will not weigh the evidence or make findings of fact. *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, facts are viewed and reasonable inferences are drawn

in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court's role, therefore, "is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *Morrision*, 323 F.3d at 924.

## III. DISCUSSION

### Geico's Motion for Summary Judgment

Geico moves for summary judgment, contending that the undisputed material facts show that it acted in good faith at all times in handling the claim. Plaintiff counters that under the totality of the circumstances, whether Geico acted in bad faith is a question for the jury.

Florida law recognizes third-party bad faith actions brought by an insured or the injured third party against the insured's liability carrier.[3] *QBE Ins. Corp. v. Chalfonte Condo. Apartment Ass'n, Inc.*, 94 So. 3d 541, 545 (Fla. 2012); *Fidelity & Cas. Co. v. Cope*, 462 So. 2d 459, 461 (Fla.1985). "[T]he critical inquiry in a bad faith is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 7 (Fla. 2018).

Geico "ha[d] a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony Insurance Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla.1980). This good faith duty requires "the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same." *Bos. Old Colony Ins. Co.*, 386 So. 2d at 785.

In determining whether Geico acted in bad faith, the "totality of the circumstances" are

[3] In cases founded on diversity jurisdiction, such as this, the substantive law of the forum state applies. *Bravo v. United States*, 577 F.3d 1324, 1325 (11th Cir. 2009)

considered. *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). The issue, therefore, "is whether, under all of the circumstances, the insurer could and should have settled the claim within the policy limits had it acted fairly and honestly toward its insured and with due regard for his interests." *Id.* at 679.

Generally, the question of bad faith is for the jury. *Id.* at 672-73; *see Gutierrez*, 386 So. 2d at 785 ("The question of failure to act in good faith with due regard for the interests of the insured is for the jury."); *see also Campbell v. Gov't Employees Ins. Co.*, 306 So. 2d 525, 530-31 (Fla. 1974) ("[R]easonable diligence and ordinary care [are] material in determining bad faith. Traditionally, reasonable diligence and ordinary care are considerations of fact – not of law.").

However, summary judgment in favor of an insurer is appropriate where, as here, the undisputed material facts show that no reasonable jury could conclude that the insurer acted in bad faith. *Daniels v. GEICO Gen. Ins. Co.*, 740 F. App'x 665, 668 (11th Cir. 2018) ("Although the issue of bad faith is ordinarily a question for the jury, the Florida Supreme Court and the district courts of appeal have, in certain circumstances, concluded as a matter of law that an insurance company could not be liable for bad faith." (quoting *Cadle v. GEICO Gen. Ins. Co.*, 838 F.3d 1113, 1123-24 (11th Cir. 2016)); *Davidson v. Gov't Employees Ins. Co.*, 2010 WL 4342084 (M.D. Fla. Oct. 26, 2010), aff'd, 422 F. App'x 790 (11th Cir. 2011). *See also, e.g.*, *Valle v. State Farm Mut. Auto. Ins. Co*, 394 F. App'x 555, 557 (11th Cir. 2010) (affirming district court's granting of summary judgment in favor of the insurer); *Barnard v. Geico Gen. Ins. Co.*, 448 F. App'x 940, 944 (11th Cir. 2011) (same); *Kwiatkowski v. Allstate Ins. Co., Inc.*, 2017 WL 3671108, at *4 (M.D. Fla. Jan. 11, 2017), aff'd sub nom. *Kwiatkowski v. Allstate Ins. Co.*, 717 F. App'x 910 (11th Cir. 2017) (granting summary judgment in favor of the insurer).

**Under the totality of circumstances, Geico acted diligently, and in good faith**

Considering the totality of the circumstances, no reasonable jury could conclude that Geico acted in bad faith. The undisputed material facts demonstrate that Sterling, on behalf of Geico's insured, acted "diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Notwithstanding her diligence, Spivey never made himself available and did not respond to her many attempts to discuss and consummate the settlement. Only after he received Sterling's September 16, 2009 letter referencing a settlement did he respond, accusing her of creating a "false record."

While Spivey represented that his clients were "ready" to settle, he subsequently rejected Geico's settlement offer, purportedly because Sterling failed to forward the insurance disclosures and information he had demanded. However, as confirmed by the certified return receipt his office had signed, the insurance disclosures and information had been furnished within the time frame he demanded. And notwithstanding Sterling's letter confirming his receipt of the insurance disclosures and information, and offering to consider proposals to modify the release, Spivey apparently ignored the offer and filed suit. At all times, Sterling kept Plaintiff advised of her attempt to settle, copied him on all correspondence, warned him of the possibility of an excess judgment, and advised him of his right to seek independent representation. (Dkt. 39-12)

**Sterling acted with diligence**

Within six days of receiving notice of the loss, Geico offered the BI policy limits. Sterling made numerous attempts to communicate with Spivey, and provided prompt responses to his letters and demand for statutory disclosures. Despite Spivey's failure to make himself available, Geico tendered the $10,000 BI policy limits with a proposed release. Over the next three months, Geico

repeatedly attempted to communicate with Spivey and consummate the settlement of the Renotieres' claim, to no avail.[4]

When Spivey finally responded to Geico, indicating his clients were "ready" to settle, Geico promptly responded and provided him with the insurance disclosures and information he demanded. Geico indicated that the release sent with the check was a *proposed* release, and more than once offered to review any proposed language Spivey might have, even after he rejected Geico's offer to settle. (See Dkts. 39-11, 39-19, 39-23) Spivey did not propose any modifications, instead filing suit against Plaintiff.

**Sterling's negligence does not constitute bad faith**

Plaintiff contends that a jury could reasonably find that Sterling was negligent in handling the Renotieres' claim through a "pattern of conduct." He contends she was negligent in three respects:

> (1) first, by addressing the initial tender letter to the wrong attorney, (2) then, by providing a release with language that was deemed objectionable by the claimants' attorney and not correcting it, and (3) finally, by making a false statement in writing regarding a settlement agreement that never occurred.

(Dkt.43 at 12).

Plaintiff contends that a jury could conclude that when Sterling's conduct is viewed together, it rose to the level of bad faith. During oral argument, Plaintiff's counsel argued that Sterling's "mistakes" are circumstantial evidence of incompetence and demonstrate that Geico should have improved its claims handling process. This argument is not persuasive. First, Plaintiff concedes that any one of these"mistakes," taken alone, could be dismissed as mere inadvertence or oversight. (Dkt.

[4] Between correspondence and telephone calls over the course of three months, Sterling attempted to communicate with Spivey approximately 9 times before he responded on October 13, 2009.

43 at 12). And he acknowledges that although negligent conduct is relevant to an insurer's good faith, negligent conduct without more does not amount to "bad faith." *DeLaune v. Liberty Mut. Ins. Co.*, 314 So.2d 601, 602–03 (Fla. 4th DCA 1975).

That Sterling addressed her July 1 letter to Plaintiff's attorney, rather than Spivey, even if negligent, is not, considering the totality of circumstances, indicative of bad faith. First, it is undisputed that the letter was actually faxed to and received by Spivey's office. Sterling also called that day and spoke with Spivey's assistant, confirming that Geico wanted to tender the check. It is likewise undisputed that the check was actually sent to Spivey's office. And, Sterling corrected the address five days later, once she realized her error.

Plaintiff contends that Spivey's October 13 letter constituted an offer to settle because it informed Sterling that Geico's proposed release was overly broad and should release only bodily injury claims, not property damage claims.[5] Essentially, Plaintiff contends that Sterling should have responded with a release that mirrored Spivey's vague requests, and Geico should have and could have settled the claim. Plaintiff provides no authority for this contention, however.[6]

---

[5] The portion of the letter on which Plaintiff relies states:

> Furthermore, if there ever is a settlement in this case, my clients will certainly not sign the overly broad release you sent me, with the language about how no representations have been made to them. My clients would obviously have to rely upon the complete insurance disclosures to verify the amount of the available liability insurance coverage.
>
> It is disappointing to have to take this tone with you, but I do not know what else you would have expected when you sent me that letter. These aggressive tactics are completely unnecessary. Before I received your false letter, I was just about to send you a friendly note saying that my clients were ready to resolve their bodily injury claims and that they would sign a general release of those claims against your insured if I received the release along with all the insurance information as requested in the attached form.

(Dkt. 39-18).

[6] *Compare Kwiatkowski*, 2017 WL 3671108, at *4 (letter manifesting merely a willingness to enter into settlement negotiations is not an offer).

Indeed, the undisputed material facts show that Sterling promptly responded to Spivey's letter, offering to consider any proposed release language or addendum he suggested. Notwithstanding, Spivey never responded. Moreover, it is not clear from Spivey's October 13 letter exactly what changes he was requesting to the proposed release. Other than his contention that it was overly broad and that his clients were "ready" to resolve their bodily injury claims, he offered no modifications to the release.[7] And, the first time Spivey mentioned property damage was in his November 2 rejection letter.[8] (Dkt. 39-20).

Finally, Plaintiff's contention that Sterling's September 16 letter, which stated "[w]e have reached an agreement to settle this claim," was an attempt to "create a paper trail consistent with GEICO's position that it was settling the case," is not persuasive. (Dkt. 43 at 9). While this letter may have, at best, been poorly worded, and at worse, carelessly worded, it cannot be said, under the totality of the circumstances, that this amounted to bad faith, particularly considering that settlement

---

[7] Plaintiff also relies on the opinions of his expert, Peter Knowe, to support this argument. Knowe testified:

> [Geico's] actions deviated from the standard of care for a reasonable insurance carrier in a similar position with clear liability, reasonable liability, clear coverage, an offer to settle, and a failure to achieve the settlement was within the reasonable expectation of an insurance professional handling this claim in the state of Florida for any other carrier in the similar situation.

(Deposition of Peter Knowe, Dkt. 39-29 at 92:2-93:18). And he opined that Spivey's October 13 letter was "a reasonable settlement opportunity that GEICO could have and should have accepted." (Id.)

Notwithstanding, Knowe's opinion does not create a disputed issue of material fact as to whether Geico acted in bad faith. First, his testimony merely summarizes Plaintiff's arguments. Second, while he may have an opinion about whether Geico met what he considers to be the standard of care and whether Spivey's letter constituted a settlement offer, his opinions do not constitute material facts with respect to whether Geico acted in bad faith.

The underlying facts material to a resolution of the question of bad faith control, not the opinion of an expert. And, as noted, the underlying facts are undisputed, regardless of Knowe's interpretation of the facts. *See Moore v. GEICO Gen. Ins. Co.*, 633 F. App'x 924, 931 (11th Cir. 2016) ("[T]he court should accordingly evaluate the testimony under the usual standards for admissibility, see Fed.R.Evid. 702, and decide what relevance, if any, the testimony has to the creation of a genuine dispute of material fact. The court should not simply ignore the testimony or deem the expert not credible.")

[8] Indeed, Sterling's November 13 response to Spivey inquired whether the Renotieres were making a claim for personal property, given that Renotiere was a passenger in Plaintiff's vehicle. (Dkt. 39-23).

of the claim required a response from, and action by, Spivey and his clients. And, as Plaintiff concedes, this alone could be dismissed as inadvertence or oversight.[9]

**Conclusion**

In sum, no reasonable jury could conclude that Geico acted in bad faith in handling the Renotieres' claim. Even viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that settlement could or would have been achieved if Sterling had not made the three mistakes Plaintiff relies on.[10] *See Kemp v. USAA Cas. Ins. Co.*, 709 F. App'x 650, 654 (11th Cir. 2017). The totality of the circumstances demonstrate that Geico acted diligently, fairly, and honestly, and could not have settled the claim within the policy limits. *Berges*, 896 So. 2d at 679-78.[11]

---

[9] The Court is not persuaded that Sterling's inability to recall many of the details of this claim nine years later in her deposition is relevant to whether Geico acted in bad faith in handling the claim, particularly considering that the underlying material facts are undisputed. Rather, the relevant temporal perspective is when Sterling interacted, or attempted to interact, with Spivey's office.

[10] Indeed, "[A] valid bad faith claim requires 'a causal connection between the damages claimed and the insurer's bad faith.'" *Mesa v. Clarendon Nat. Ins. Co.*, 799 F.3d 1353, 1359 (11th Cir. 2015) (quoting *Perera v. U.S. Fid. & Guar. Co.*, 35 So.3d 893, 903–04 (Fla. 2010)); *Messinese v. USAA Cas. Ins. Co.*, 622 F. App'x 835, 838 (11th Cir. 2015). Any negligence by Sterling could not have been the cause of the excess judgment. And, even if Sterling's purported incompetence circumstantially demonstrates an issue with Geico's claims handling process, that does not rise to the level of bad faith. *See Mesa*, 799 F.3d at 1360 ("While such a claim is indubitably supported by the facts in the record, it demonstrates at best a need for Clarendon to augment its claims practices, not that Clarendon's actions rose to the level of bad faith.").

[11] An insurer does not act in bad faith when it has difficulty communicating with the claimant's attorney. In *Barnard v. Geico Gen. Ins. Co.*, 448 F. App'x 940, 944 (11th Cir. 2011), the Eleventh Circuit concluded:

> In sum, no rational juror could conclude that, given the totality of the circumstances, Geico acted in bad faith when it attempted for over six months to settle the claim at issue. Upon receiving Zawahry's letter, Geico investigated the requests made therein and responded accordingly, attempting again to contact Zawahry to no avail. It hired a lawyer to set up an estate for the deceased child in a manner that would protect the insured. The district court properly granted summary judgment in light of Zawahry's 'inexplicable evasive behavior' that was both 'outrageous and unprofessional.' No reasonable juror could conclude that the failure to settle was due to Geico's bad faith when Baxley's former lawyer thwarted settlement attempts by being unavailable and ignoring nearly all of Geico's communications.

In *Cardenas v. Geico Cas. Co.*, 760 F. Supp. 2d 1305, 1310 (M.D. Fla. 2011), the district court held:

Accordingly, Geico's Motion for Summary Judgment (Dkt. 39) is **GRANTED.** Plaintiff's Motion for Partial Summary Judgment on Affirmative Defenses (Dkt. 37) is **DENIED *as moot*.** The motions in limine (Dkts. 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70) are **DENIED *as moot*.** The Clerk is directed to **ENTER FINAL JUDGMENT** in favor of Geico General Insurance Company and against Waldemar Baranowski and **CLOSE** the file.

**DONE AND ORDERED** this 29th day of April, 2019.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

---

Furthermore, Geico stated a willingness to consider both a change to the propose release and a release drafted entirely by Luhrsen. Luhrsen once again failed to respond. Cardenas cannot—now that Cardenas faces a judgment substantially in excess of the policy limit—rely on some supposed defect in Geico's proposed release or on Geico's inadvertent (but quickly rectified) failure to tender a second, certified copy of the policy. The facts of this action demonstrate no basis upon which a reasonable jury could conclude that Geico acted "solely on the basis of [Geico's] own interest" in attempting to settle the claim. In fact, the facts demonstrate the Geico acted promptly, diligently, and with due concern for Cardenas's best interest.

And although "in Florida, 'the focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured,' *Berges*, 896 So. 2d at 677," the Eleventh Circuit has explained that "'a bad-faith claim derives from and emphasizes the duty of the insurer to the insured, [and] the conduct of a claimant and the claimant's attorney are relevant to determining the 'realistic possibility of settlement within the policy limits.'" *Cousin v. GEICO Gen. Ins. Co.*, 719 F. App'x 954, 960 (11th Cir. 2018) (quoting *Barry v. GEICO Gen. Ins. Co.*, 938 So. 2d 613, 618 (Fla. 4th DCA 2006)).

To this end, the Supreme Court's holding in *Harvey* does not change the outcome. *Harvey* stands for the proposition that courts should not focus on the insured's actions to "let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim." *Harvey*, 259 So. 3d at 11.